FILED

2019 Sep-24  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. HEATHER RANEY, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-CV-01269-AKK |
| | ) | |
| AMEDISYS, INC., | ) | |
| AMEDISYS HOME HEALTH OF | ) | **FILED UNDER SEAL** |
| ALABAMA, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED *QUI TAM* COMPLAINT

COMES NOW Relator Heather Raney ("Raney" or "Relator"), on behalf of herself and the United States of America, and pursuant to 31 U.S.C. § § 3729-33 (the "False Claims Act") alleges and claims against Defendants Amedisys, Inc. and Amedisys Home Health of Alabama, L.L.C. (collectively referred to herein as "Amedisys"), as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a) as well as under 28 U.S.C. § 1345. Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of

substantially the same "allegations or transactions" alleged in this Complaint. Even to the extent there has  been any such public disclosure, Raney meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial District, and can be found here. Furthermore, Defendants committed within this judicial District acts proscribed by 31 U.S.C. § 3729. As detailed below, the Defendants' actions and omissions have caused years of improper and false billings to the United States through the Medicare program.

## PARTIES

3.     Amedisys, Inc. is a Baton Rouge, Louisiana - based corporation engaged in the business of providing home health and hospice services. Amedisys is one of the nation's largest home health and hospice care providers, with over 300 care centers nationwide.

4.     Amedisys Home Health of Alabama, L.L.C. is an Alabama limited liability company engaged in the business of providing home health and hospice services in the State of Alabama.

5.     Amedisys operates its home health business with the intent of fraudulently maximizing its billing to and reimbursement from the United States.

6.     Relator Raney is a licensed registered nurse (RN) of 11 years experience. She became employed by Amedisys on June 5, 2017 as a "Director of Operations /Administrator". In her duties as *Director of Operations*, she covered Amedisys' Tuscaloosa, Alabama location throughout her employment, and she also temporarily covered the Fayette, Alabama location beginning in July 2018. Additionally, in her duties as *Administrator*, she covered Amedisys' Tuscaloosa, Fayette and Brent locations.

7.     Ms. Raney became aware that Amedisys' business practices were designed to fraudulently maximize billing to the United States by falsely representing the type and severity of patients' medical conditions. Ms. Raney communicated her concerns to her superiors at Amedisys, including its Area Vice President of Operations, Mike Brown, Regional Vice President of Operations, Cami Oravetz, Regional Vice President of Business Development, Rhonda Sanders, Regional Vice President of Clinical, Tara Maher, and its Senior Vice President of Home Health, Billy Grau. She was met with hostility and was terminated in retaliation for her resistance to Amedisys' fraudulent practices on or about June 26, 2019.

8.     Ms. Raney has witnessed numerous instances in which Amedisys has fraudulently inflated its Medicare billing to the United States and in which Amedisys billed Medicare for patients whom it knew were not homebound and did not qualify

3

for the Medicare home health benefit. Through her experience, Relator has become convinced that Amedisys' fraudulent schemes represent wide-spread systematic practices endemic to Amedisys. Amedisys' conduct is offensive to Relator as a dedicated healthcare professional. Accordingly, she filed this action as original-source relator under the qui tam provisions of the False Claims Act.

9.     Raney concurrently served upon the Attorney General of the United States and the United States Attorney for the Northern District of Alabama the original complaint and a written disclosure summarizing the known material evidence and information in the possession of Plaintiff related to the original Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. The documents referenced in the disclosure statement, and those produced in connection therewith or subsequently, are incorporated herein by reference.

## MEDICARE HOME HEALTH COVERAGE

10.     Through the Medicare program administered by Center for Medicare and Medicaid Services (CMS), the United States provides health  insurance  to eligible citizens. See 42 U.S.C. §§ 1395, *et. seq.* As part of its coverage, Medicare pays for some "home health services" for qualified patients. In order to qualify for home health care reimbursement under Medicare, a patient must:  (1) be homebound

- i.e., the patient is generally confined to her home and the patient cannot leave home without "considerable and taxing effort"; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). See 42 U.S.C. 1395(f). When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

11.     Medicare pays for home health care by way of a Prospective Payment System (PPS). See 42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Set (OASIS) instrument. The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service).

Based upon the OASIS information - and in tum upon the expected cost of caring for the patient - the patient's "case mix assignment" is determined and the patient is assigned to one of 80 Home Health Resource Groups (HHRGs). The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

12.     Once the HAA has submitted the patient's OASIS information, partial payment is made based on a presumptive 60-day episode. In order to continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be performed. Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition and the health services performed.

## FRAUDULENT SCHEMES

13.     Through a system of falsifying and manipulating Medicare-required patient OASIS information, Amedisys systematically and fraudulently boosts its Medicare prospective payments. Medicare's home health PPS is intended to cover the projected cost of patient care. To that end, Medicare requires that an HHA registered nurse or therapist make an initial visit to each patient and perform a comprehensive assessment using the OASIS instrument. Medicare's prospective

6

payment for that patient is then tied to the type and intensity - and therefore cost - of care that will be required. For example, a patient that is completely bed-bound manifestly requires more care - at greater expense - than a patient that is ambulatory. Similarly, some conditions, such as CVA (stroke) may require extensive, costly, physical and occupational therapy, whereas others, such as minor wound care, may require only limited skilled nursing care and instruction. The admitting HHA nurse is responsible for developing a physician-approved plan of care based on the patient's clinical diagnosis and observable characteristics. Based  upon the OASIS codes reported by the HHA, the patient is associated with one of 640 HIPPS codes that are designed to provide the most accurate payment for each patient. With the goal of fraudulently placing patients in higher-value groups and boosting Medicare payments, Amedisys systematically manipulates the PPS.

14.    Specifically, the Clinical Managers are systemically instructed to achieve desires outcomes by engaging in fraud. At eleven Alabama locations, the Clinical Managers were under the direction Area Vice President of Operations, Mike Brown. Mike Brown reported directly to the Regional Vice President of Operations, Cami Oravetz, who since June 2016 was responsible for office and clinical operations of 76 care centers in the South and Midwest region of the United States. Each of the fraudulent billing practices described herein were directed and orchestrated by Ms. Oravetz and corporate executives above her.

15.    Raney was told by Mike Brown and Cami Oravetz on multiple occasions, "You have to drink the Amedisys Kool-Aid – if you don't, you won't make it".  Below are a variety of ways that Amedisys committed blatant Medicare fraud:

**A.    Driveway Calls**

16.    OASIS scoring is based on patient observation by the admitting HHA nurse and based on what the individual patient tells the admitting HHA nurse that he can safely do. This is done at the initial evaluation visit. Rather than accepting the assessment provided by the admitting HHA nurse, who is in the best position to evaluate the patient, including whether, for example, the patient is actually ambulatory or in fact home bound, the admitting nurse is ordered not to submit the information gathered from her assessment to OASIS until the Clinical Manager to whom the nurse reports is given a chance to manipulate this information. Referred to at Amedisys as "driveway calls" (i.e. made before the attending HHA nurse leaves the patient's driveway and before the patient scores are actually entered into the system), the admitting HHA nurse is required to call the Clinical Manager and report all initial assessment findings and give the Clinical Manager an opportunity to intervene and cause revisions to the nurse's findings.  These changes were meant to maximize Medicare revenue despite the HHA nurse's actual observations. These revisions were made not just to initial evaluations, but also to re-certifications (i.e.

the beginning of a patient's new episode) and resumptions of care (i.e. when a patient was released from the hospital).

17.    These revisions were extremely common and made solely for the purpose of exaggerating the patient's condition to make their condition appear worse than it was in order to ensure that every patient was billed at the highest possible level, regardless of the patient's actual condition and care needs. One of the admitting HHA nurses, Brittany Griffin, asked Raney, "What's the point of my evaluation when it's going to be changed anyway?" Ms. Griffin's Clinical Managers were Lindsey Smalley, Rita Gurganous and Jan Booth.

### B.    Fraudulent Revisions to OASIS Information.

18.    In some cases a "driveway call" was not possible because of, i.e. the unavailability of a Clinical Manager, and in those cases the Clinical Manager, who again had no personal interaction with the patient, would require the admitting HHA nurse to simply manipulate the OASIS information after it was in the system to achieve billing at the highest possible level. These changes were directed by Mike Brown to the Clinical Managers. These manipulations would include such things as altering information to qualify a patient for home bound status when he otherwise would not qualify, and altering information to cause a patient to qualify for a certain number of therapy visits when they were not justified.

### C.    Falsely Reporting OASIS Assessment Data for Diabetic Patients.

19.    Amedisys' Coding and OASIS Specialists, including Heather Caffee, were consistently instructed and pressured by their supervisors, including Amy Allen, to falsely report the OASIS assessment data for diabetic patients. Medicare pays a very high prospective rate for patients who are referred to home care for sudden onset of diabetes or complications of a diabetic condition; such patients require outpatient diabetic instruction as well as therapeutic treatment. Accordingly, Amedisys' coding and OASIS specialists are instructed to fraudulently make diabetes a patient's "primary diagnosis" even when that condition is entirely unrelated to the actual reason the patient has been referred to home care. Such a patient may have lived with diabetes for years and require no instruction or therapy. Diabetic instruction or related therapy therefore forms no legitimate part of the patient's home health care plan. Amedisys falsely bills the United States and accepts payment for services that are not eligible for reimbursement.

20.    For example, on January 2, 2018, patient I.M. was assessed by Brittany Griffin and Ms. Griffin listed the patient's primary diagnosis and reason for home health as a foot wound. The patient was diabetic but was well-educated as to her disease process and her condition was well-managed. The patient required no further instruction, therapy, or care related to her diabetic condition. Nonetheless, Griffin's assessment was revised by an Amedisys coding and OASIS specialist to reflect

diabetes as the primary diagnosis – to result in a much higher prospective payment. When this assessment was later reviewed by the patient's physician, Dr. Arash Arabi, M.D., he noted that the assessment was "INCORRECT" and should have stated, "superficial ulcer on the heel", further stating, "this is not right".

**D.     Falsification of Homebound Status.**

21.     As the Director of Operations/ Administrator, it came to Raney's attention that patients were being characterized as homebound when in fact they were not. On one occasion on April 16, 2019, admitting nurse Brittany Griffin evaluated patient E.H. for home health services. Upon her evaluation, Ms. Griffin discovered that E.H.'s treatment would not be skilled care – the application of a simple wet to dry dressing was a treatment not covered by Medicare because it can be managed by a family member. Ms. Griffin also believed the patient was not home bound and called her Clinical Manager, who deferred to Raney. Raney recommended not admitted E.H. at that time. E.H. was able to drive herself everywhere, including initially driving to the local hospital to have the dressing attended.

22.     Raney happened to be meeting at the Homewood office that day with all area vice presidents and vice presidents of business development, clinical and operations, and this matter was brought to the attention of management present at the meeting by Care Transitions Coordinator, Amy McNees. The question was posed

to the group whether E.H. should be admitted to home health care during the meeting, and Tara Maher, the Vice President of Clinical, stated to Raney, "I know you're going to admit her because I said so".

23.     On April 17, 2019, in the wake of Tara Maher's directive, Raney was summoned to meet with the Vice President of Business Development, Rhonda Sanders, and her boss, Senior Vice President of Home Health, Billy Grau, to discuss E. H.

24.     Mr. Grau announced after hearing details of E.H's situation, "If it's a Medicare then we say yes". E.H. was then admitted to home health care despite everyone involved knowing of the fraud, and in spite of Raney's efforts to take a lawful approach to this situation.

25.     From this point forward, Raney was retaliated against, beginning with a poor annual review from Mike Brown that he had to revise for lack of any basis, followed by being shadowed by Robin Winstead, the new Regional Operations Director,  and ending with Raney's termination for purely pretextual reasons.

26.     In addition to E.H., another patient, D.B., was admitted for home health care by Amedisys in Tuscaloosa, Alabama following a discharge from DCH hospital. D.B. was not home bound and was able to drive himself to the liquor store, and as a result of not being home bound, missed at least three visits because he was not at home when services were attempted at his home.

27.     Another patient on home health care who was improperly admitted and was not home bound, L.H., was able to drive himself all over Tuscaloosa, Alabama for whatever he needed, and he was able to drive approximately 60 miles to Jasper, Alabama for a court appearance.

### E.     Keeping Patients a Minimum of Two Episodes.

28.     Mike Brown, Cami Oravetz, Raney and all Clinical Managers received compensation bonuses that were based on patient revenues budgeted by the Amedisys corporate office.  Raney was required to report admissions to home health care and all re-certifications, which factored heavily into these bonuses. As a result, Clinical Managers were incentivized and instructed by Mike Brown to attempt to keep all patients for at least two episodes, regardless of their particular needs. The number of patient episodes was purely driven by revenue.

### F.     LUPA Avoidance at all Cost.

29.     Every Monday, the Clinical Managers created a Low Utilization Payment Arrangement ("LUPA") report under the direction of Mike Brown. A LUPA occurs when four or fewer visits are provided to a patient in a 60-day episode. With a LUPA, instead of an episode payment for a 60-day period based on the HIPPS code, payment is based on a national standardized per visit payment by discipline, a greatly reduced amount.

30.     These LUPA reports were presented to Raney and then to Mike Brown. The Clinical Managers were required to determine why each patient was a LUPA. Mike Brown instructed Raney to keep a list of LUPA patients with doctor's appointments and have the clinicians call the patients to make sure they had no additional home health needs, in an attempt to schedule additional visits within the 60-day time frame to avoid LUPA status, without regard to the actual care needs of the patient. For example, the clinicians called to schedule discharge planning when there was no clinical need for it. In other cases, the Clinic Managers would increase the frequency of therapy or nursing appointments or add a social worker into the treatment to avoid dreaded LUPA treatment, often all right at the end of the 60-day episode. Also, often the patient did not want these crammed visits and/or were not homebound. Frequently these situations were contentious with patients, who had no way of knowing that they were being treated not based on their needs but instead based on Amedisys' desperation to avoid LUPA status. In one case, the patient threatened to call the police for harassment.

31.     Amedisys social workers and nurses also kept a LUPA list and were required to call on monthly patients to see if there was anything they could do to come out and see them so they would not end up as LUPAs.

32.     It was extremely rare for former patients to call Amedisys and request additional home health services at the end of their treatment. However, some

Amedisys Account Executive and Care Transitions Coordinators, including Ginger Bowen in Fayette, Alabama, would call former Amedisys patients solely to increase revenue in a given month. To do so, they could print a report from the Amedisys database used in cold calling the patients to obtain their permission to call their doctors to schedule additional home health services, regardless of their needs.

### G.    Maximizing Therapy Services.

33.    It was the rule rather than the exception for a large number of therapy services (physical therapy, speech therapy or occupational therapy) to be added in the OASIS assessment at the beginning of treatment, despite the fact that it was always unknown how many visits would be appropriate for the particular patient until treatment was ongoing. Because therapy services were the most lucrative, it was nearly automatic that at least fourteen treatments were entered. On February 14, 2018, Raney attended a Director Meeting in which increasing therapy income was the focus. At the meeting, Clinical Managers were ordered to maximize the number of therapy visits before beginning therapy to increase revenue. This guaranteed that certain therapy treatments would be unnecessary.

### H.    Billing for Services Not Performed.

34.    On two occasions Raney terminated employees when it became apparent that they had not actually treated their patients, but Amedisys took no steps to rectify any improper billings for these patients. Loretta Hargrove had been with

the company for approximately 30 years and falsified company records stating that she had treated several patients, including J.B. J.H. and S.A., when she had only gone to their homes and relaxed in front of the television, or otherwise not fulfilled her responsibilities. When her patients complained, Raney fired her, but despite reporting these matters to Mike Brown and Human Resources there was no investigation conducted to learn the extent of Medicare billings for services that had not been performed or any attempt to refund any payments wrongfully received from Medicare.

35.     Dewayne Mack was another employee who falsely certified patient treatments. When Raney learned that Mr. Mack had attempted record home health services to a patient, S.C., who was actually admitted in the hospital at the time of the purported services, he was terminated. However, no investigation was conducted by Amedisys to determine the extent of his fraud or to refund any Medicare payments.

36.     Raney also received complaint from a patient, C.G., that LPN employee Martha Sanders had not taken vital signs from her or "even touched her" during a visit on February 5, 2018. After investigating this matter, Raney submitted a formal complaint to Mike Brown, who did nothing to address it.

**I.     Aggressive Referral Targeting/ Kickbacks.**

37.     Prior to being discharged from a particular hospital into home health care, each patient is supposed to have a choice of who the home health care provider will be. However, Amedisys Care Transitions Coordinators, including Amy McNees, engaged hospital case managers to cause Amedisys to be identified on the doctor's discharge order as the home health provider. Because a Care Transitions Coordinator's compensation is based upon the number of referrals, it was common for them, including Ms. McNees, to shower hospital case managers, including DCH Hospital Case Manager, Michelle Bentley (a former Amedisys Clinical Manager), with meals, entertainment and other forms of remuneration in order to remain the referral of choice. In May 2019, Ms. McNees confided to Raney that DCH had been investigating the overwhelming number of referrals made to Amedisys (for which Ms. McNees received credit towards her bonuses) by Michelle Bentley.

38.     Moreover, Amedisys Care Transitions Coordinators, including Ms. McNees, targeted only those patients who had insurance coverage through Medicare, Tricare, Triwest and Blue Cross Blue Shield Advantage (its Medicare Advantage Plan), as their bonuses were linked solely to income from these plans. If a patient had some other health care plan, they might be accepted, but they certainly were not pursued.

**J.     Concealing Fraud.**

39.     On June 27, 2018, Raney attended a Clinical Manager meeting in which Mike Brown stated that patients were not allowed to have more than 20 therapy visits unless he approved them. This direction was also made by Mike Brown on February 19, 2019 and on other occasions. Mr. Brown also required therapy visits to be staggered in order to ensure the therapy visits did not exceed 20 visits in one episode. He stated that the reason for this rule is that it demonstrates to the Office of Inspector General (OIG) the presence of "questionable billing practices". Mr. Brown further stated in this meeting that only 3% percent of patients should have more than 20 therapy visits and only 2% should have more than 24 therapy visits for Amedisys not to draw OIG scrutiny. He also stated that if they had greater than 24 visits they needed a neurological diagnosis (i.e. a stroke) so not to draw OIG scrutiny.

40.     Amedisys received a Target Probe Education ("TPE") audit by Medicare in March 2019. To address the audit, Mike Brown led a meeting on or about March 1, 2019 with Raney, Lindsey Giddens, Director of Operations in Brent, Alabama and Melanie Farley, Area Vice President of Clinical present. Mike Brown instructed during the meeting about how to get through the audit by holding certain billings until the last phase of the audit, and specifically instructed "don't send incriminating stuff."

**K.     Unauthorized Physical Therapy**

41.     When Raney began working at the Amedisys location in Fayette, Alabama in or around July 2018, she observed that there had been no licensed physical therapists employed at that location for approximately six (6) months, and she also observed that numerous physical therapy visits were not getting completed. Those visits would have been for evaluations, recertifications, functional assessments, supervisory visits and discipline discharges. Medicare Conditions of Participation (COP) require that functional evaluations and supervisory visits were to be completed within thirty (30) days of treatment beginning, and if the functional assessments or supervisory visits were not conducted in that time frame, then any physical therapy treatments beyond the 30th day of treatment were not reimbursable by Medicare.

42.     With no physical therapists in Fayette, the patient population for that location should not have received treatment beyond thirty (30) days, but that did not stop Amedisys from having their physical therapy assistants treat in days 31-60 and bill for non-reimbursable services anyway. This practice continued until Raney became aware of it, at which time it ceased. However, this affected hundreds of patients (approximately 75 per month just in Fayette), causing approximately 60 improper visits per patient per month while these improper treatments were ongoing.

43.     This practice was not only a problem in the Fayette, Alabama area. Raney observed this practice also occurring in the Trussville, Alabama area and

believed it to be widespread nationwide, since no effort was made by anyone other than her to address it.

**L.     Education of SCALF Patients.**

44.     One of the services provided by Amedisys involves educating patients about their condition and ongoing care. When a patient is in a Specialty Care Assisted Living Facility (a "SCALF"), Medicare will not cover the cost of educating the patient, because the patient is unable to receive any benefit from the education. On October 19, 2017, Raney learned that education services were being provided to SCALF staff at Morning Pointe of Tuscaloosa, The Tides at Crimson Village, and Brookdale Northport Specialty Care and ordered these services to immediately stop because the services were not reimbursable by Medicare. Raney reported this matter to Mike Brown as well as Kim Cramer, Amedisys' Regional Psychiatric Nurse Educator. These services were nevertheless billed to Medicare, and nothing was done to investigate the extent of these services performed and billed from other SCALFs.

## COUNT ONE
## FALSE CLAIMS UNDER 31 U.S.C. § 3729

45.     Relator adopts and incorporates the previous paragraphs as  though fully set forth herein.

46.     By and through the fraudulent schemes described herein, Amedisys knowingly - by actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information - presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    false "OASIS" patient care assessments designed to inflate Medicare prospective payments and false claims based on such assessments;

(b)    false claims for therapy services that were unnecessary, never performed, or both;

(c)    false claims for home health care provided to patients whom Amedisys knew were not homebound and false records designed to create the false appearance of homebound status.

47.    The United States paid the false claims described herein and summarized in paragraph 39(a)-(c).

48.    By and through the actions described supra, Amedisys knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare.

49.     Amedisys' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Amedisys by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the damages sustained by reason of Amedisys' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and pursuant to any agreement with the Office of Inspector General, attorneys' fees, costs, interest, and such other, further, or different relief to which Relator may be entitled.

## COUNT TWO
## REVERSE FALSE CLAIMS UNDER 31 U.S.C. § 3729

50.     Relator incorporates all previous paragraphs as though fully set forth herein.

51.     By and through the acts described herein, Amedisys knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States, to wit:

22

(a)     Defendants knew that they had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b)     Defendants knew that they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

52.     Amedisys' fraudulent actions described herein have resulted in damage to the United States equal to the amount of money withheld by Amedisys in derogation of its obligations to refund the United States.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the damages sustained by reason of Amedisys' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and pursuant to any agreement with the Office of Inspector General, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

### COUNT THREE
### CONSPIRACY UNDER 31 U.S.C. § 3729

53.    Relator incorporates all previous paragraphs as though fully set forth herein.

54.    Amedisys, in concert with its principals, agents, employees, and other institutions did agree to submit the false claims described herein to the United States, and the United States in fact paid those false claims. Likewise, Amedisys in concert with its principals, agents, employees, and other institutions did agree to reduce its obligations to the United States through the pattern and practice of reverse false claims described supra.

55.    Amedisys and its principals, agents, and employees acted, by and through the conduct described supra, with the intent to defraud the United States by submitting false claims to the United States through Medicare and Medicaid and through a pattern and practice of fraudulently withholding money from the United States through reverse false claims.

56.    Amedisys' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Amedisys and the amounts of money wrongfully withheld by Amedisys from the United States as a result of Amedisys' false claims and reverse false claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the

damages sustained by reason of Amedisys conduct and the conduct of its principals, agents, employees, and other institutions, together with civil penalties as permitted by 31 U.S.C. § 3729 and pursuant to any agreement with the Office of Inspector General, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

## COUNT FOUR
## RETALIATION UNDER 31 U.S.C. § 3730(h)

57.    Relator incorporates all previous paragraphs as though fully set forth herein.

58.    Through reporting, investigating, complaining of, and attempting to stop the fraudulent conduct of Amedisys, Relator was disciplined, retaliated against, threatened, discharged and discriminated against in the terms and conditions of her employment by Amedisys because of lawful and protected conduct and acts done by Relator in furtherance of an action under section 31 U.S.C. § 3729.

59.    Relator is entitled to all relief necessary to make her whole, including but not limited to back pay, front pay, compensatory damages  sustained as a result of discrimination, punitive damages, attorneys' fees and costs.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys as permitted by 31 U.S.C. § 3729, including back pay, front pay, compensatory damages sustained as a result of

discrimination, punitive damages, attorneys' fees and costs, and such other,

different, or further relief to which Relator may be entitled.


Respectfully submitted,


Brandy M. Lee


Brice M. Johnston

Counsel for Relator


OF COUNSEL:

Lee Law Firm, LLC
2100 First Avenue North
Suite 600
Birmingham, Alabama 35203
Phone: (205) 328-9445
Fax: (800) 856-9028
brandy@leelawfirmllc.com

Johnston Law Firm, P.C.
2100 First Avenue North
Suite 600
Birmingham, Alabama 35203
Phone: (205) 328-9445
Fax: (800) 856-9028
brice@johnstonfirmpc.com

## JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR THE TRIAL OF THIS CAUSE.**

*Brandy M. Lee*
Brandy M. Lee

## CERTIFICATE OF SERVICE

On this the 24th day of September, 2019, a copy of the foregoing pleading was sent to the following via certified mail, return receipt requested:

Don B. Long
Clinton K. Richardson
Assistant United States Attorney
United States Attorney's Office
1801 4th Avenue North
Birmingham, AL 35203

Any J. Mao
Sara McLean
Sarah M. Arni
Attorneys, Commercial Litigation Branch
U.S. Department of Justice
175 N Street, NE
Washington, DC 20002

*Brandy M. Lee*
Brandy M. Lee