## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. HEATHER RANEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No. |
| **v.** | ) | **2:19-CV-01269-AKK** |
| | ) | |
| **AMEDISYS, INC. and** | ) | |
| **AMEDISYS HOME HEALTH OF** | ) | |
| **ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Heather Raney filed this suit against Amedisys, Inc. and Amedisys Home Health of Alabama, LLC, pleading four False Claims Act violations stemming from the defendants' alleged fraudulent billing to Medicare. Specifically, Raney alleged the defendants falsified patient information and evaluations so their care would qualify for Medicare reimbursement. *See* doc. 3. Raney also pleaded that the defendants discharged her in retaliation for reporting and attempting to stop conduct she perceived as fraudulent. *Id.* at 25. After the government declined to intervene, doc. 10, Raney gave notice of her voluntary dismissal of the three FCA counts of false claims, reverse false claims, and conspiracy. Doc. 22. The court subsequently dismissed these counts, and only Raney's retaliation claim remains. *Id.*; doc. 25. The court now has before it the defendants' Rule 12(b)(6) motion to dismiss the

retaliation claim for failure to state a claim upon which relief can be granted.  Doc. 29.  The motion is fully briefed, docs. 31–32, and due to be granted.

## I.

The Federal Rules of Civil Procedure require a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).[1]  Though this does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint "must set forth 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Christman v. Walsh*, 416 F. App'x 841, 844 (11th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).   "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

---

[1] Because Raney's retaliation allegations do not depend on allegations of fraud, her complaint need only contain "a short and plain statement of the claim showing that [she is] entitled to relief" as described in this section.  *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) ("Sanchez's allegations that she complained about the defendants' 'unlawful actions' and warned them that they were 'incurring significant criminal and civil liability' would have been sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act. Because her retaliation claim did not depend on allegations of fraud, Sanchez's complaint only needed 'a short and plain statement of the claim showing that [she was] entitled to relief.'").

When a complaint fails to state a claim upon which a court may grant relief, the Federal Rules of Civil Procedure permit dismissal. FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Ultimately, this context-specific inquiry requires the court to "draw on its judicial experience and common sense" to determine whether the plaintiff has established "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678–79.

## II.[2]

Amedisys, a home health and hospice care provider, hired Raney to serve as a director of operations and an administrator for its Tuscaloosa, Alabama, and Fayette, Alabama, locations and as an administrator for the Brent, Alabama, location. Doc. 3 at ¶ 6. Amedisys tasked Raney with reviewing the evaluations of admitting nurses, whose intake would inform whether a particular patient was

---

[2] As stated, the plaintiff's allegations are presumed true for purposes of Rule 12(b)(6). *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)) ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'"). Accordingly, this section recounts the facts as described in the plaintiff's amended complaint, doc. 3. However, legal conclusions unsupported by factual allegations are not entitled to this presumption. *See Iqbal*, 556 U.S. at 662.

qualified for "home health care," and recommending whether the patient should therefore be admitted for Amedisys' services. *See id.* ¶¶ 7, 10, 21.[3] Raney also supervised other healthcare-related services provided by Amedisys at its various Alabama locations. *See id.* ¶ 44.

While performing these duties, Raney alleges she discovered Amedisys' practices "were designed to fraudulently maximize billing to the United States by falsely representing the type and severity of patients' medical conditions." *Id.* ¶ 7. For example, four months after she started at Amedisys in 2017, Raney noticed that Amedisys provided education services to staff at three specialty care assisted living facilities ("SCALFs"). *Id.* ¶ 44. Knowing Medicare would not cover the costs of these services, Raney ordered them to stop and reported the matter to Mike Brown, the area vice president of operations, and Kim Cramer, the regional psychiatric nurse educator. *Id.* Allegedly, however, these services "were nevertheless billed to Medicare, and nothing was done to investigate the extent of these services performed and billed from other SCALFs." *Id.*

On two other occasions, Raney discharged two employees "when it became apparent that they had not actually treated their patients." *Id.* ¶ 34. Raney alleges

---

[3] In order to qualify for home health care reimbursement under Medicare, a patient must, among other requirements, be "homebound," meaning the patient "is generally confined to her home and the patient cannot leave home without 'considerable and taxing effort.'" *Id.* ¶ 10 (citing 42 U.S.C. § 1395).

that Amedisys "took no steps to rectify any improper billings for these patients," even after she "report[ed] these matters" to Brown and Amedisys' human resources department. *Id.* Moreover, Raney states that Amedisys neither conducted investigations to learn the extent of potential billings to Medicare for unperformed services nor attempted to refund payments that Medicare may have wrongfully reimbursed. *Id.*

In 2018, Raney investigated a complaint from a patient that an employee failed to properly evaluate the patient. *Id.* ¶ 36. Raney "submitted a formal complaint" to Brown, but Raney claims Brown did not address the potentially unlawful billing that resulted from this employee's alleged misconduct. *Id.*

On April 16, 2019, Raney reviewed an admitting nurse's evaluation of a patient, E.H., whom the nurse determined would not require "skilled care" and was not "homebound." *Id.* ¶ 21. Agreeing with the nurse, Raney recommended against admitting E.H., whom Raney concluded was able to drive. *Id.* The same day, Raney met with Amedisys' area vice presidents and vice presidents of business development, clinical, and operations. *Id.* ¶ 22. At this meeting, Care Transitions Coordinator Amy McNees brought up E.H.'s evaluation to the group and asked whether Amedisys should admit E.H. to home health care. *Id.* In response, Vice President of Clinical Tara Maher allegedly said to Raney: "I know you're going to admit [E.H.] because I said so." *Id.*

The following day, Vice President of Business Development Rhonda Sanders and Senior Vice President of Home Health Billy Grau summoned Raney to further discuss E.H.'s evaluation. *Id.* ¶ 23. Grau purportedly announced, "If it's a Medicare then we say yes." *Id.* ¶ 24. Raney alleges Amedisys then admitted E.H. to home health care "despite everyone involved knowing of the fraud, and in spite of Raney's efforts to take a lawful approach to this situation." *Id.*

After these events, Brown gave Raney a poor annual review, and the new regional operations director, Robin Winstead, began to shadow Raney. *Id.* ¶ 25. In June of 2019, Amedisys discharged Raney for what she deems "purely pretextual reasons." *Id.* Allegedly, Amedisys "never offered any reasonable explanation to Raney as to why she was terminated" and instead treated her with hostility after she demonstrated her resistance to its practices. *Id.* ¶¶ 7, 25, 58; doc. 31 at 10. Raney filed this FCA suit shortly after her discharge. *See* doc. 1.

## III.

Raney argues that Amedisys' conduct constituted retaliation in violation of the FCA. *See* 31 U.S.C § 3730(h).[4] The defendants move to dismiss her claim, asserting that Raney fails to plausibly allege that (1) she engaged in protected

---

[4] "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

conduct under the FCA, doc. 29 at 6; (2) Amedisys was aware of her protected conduct, *id.* at 11; and (3) Amedisys discharged her because of her protected conduct, *id.* at 12.   The defendants also argue that the complaint "impermissibly relies on group pleading," failing to give the defendants proper notice of which entity is liable for which actions.   *Id.* at 14–15.   The court addresses these arguments in turn.

A.

The court turns first to the defendants' contention that Raney fails to plausibly state a claim of retaliation.   To come under the protection of the retaliation provision of the FCA, an employee must show she engaged in protected conduct—*e.g.*, took actions to stop a purported FCA violation—and that her employer retaliated against her because of that conduct.   *Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005); *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021).   This provision applies not only where an FCA action is actually filed, but also where "the filing of such an action, by either the employee or the government, was 'a distinct possibility' at the time the [employee's] assistance was rendered."   *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996).   Amendments to the FCA in 2009 and 2010 "expanded retaliation coverage to at least some set of people who make 'efforts to stop' False Claims Act violations—even if those efforts do not lead to a lawsuit or to the 'distinct

7

possibility' of a lawsuit," but the Eleventh Circuit has not yet explained what this
"new language means for would-be plaintiffs." *Hickman*, 985 F.3d at 1288.
Accordingly, if an employee's alleged actions are sufficient to support "a reasonable
conclusion that the employer could have feared being reported to the government
for fraud or sued in a *qui tam* action by the employee," then the employee has
"state[d] a claim for retaliatory discharge under § 3730(h)." *United States ex rel.
Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010). At the least,
contained necessarily within this framework are the requirements that (1) the
employee made an effort to stop potential FCA violations under the belief that the
employer made false claims to the federal government, *id.* at 1288–89; (2) the
employer was aware of the employee's protected conduct, *Mack*, 148 F. App'x at
897; and (3) the employee's protected conduct caused the adverse action against her,
*Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1358–59 (11th Cir. 2020) (applying "but-
for" causation standard). *See also United States v. HPC Healthcare, Inc.*, 723 F.
App'x 783, 791–92 (11th Cir. 2018).

1.

Raney argues that she engaged in protected conduct by complaining to her
superiors about the allegedly fraudulent characterization and admitting of the patient
E.H., ostensibly for the purpose of submitting fraudulent bills to Medicare. Doc. 31
at 7. And in her complaint, Raney pleads multiple instances in which she reported

8

alleged misconduct to Brown, Amedisys' area vice president of operations, regarding unperformed services for patients, which Raney states led to improper billing to Medicare that went unchecked and uninvestigated.  Doc. 3 at ¶¶ 34, 44; *see also* doc. 31 at 8. The question is thus "whether [Raney's] complaints of illegal activity occurred when there was a distinct possibility that she or the government would sue the defendants under the False Claims Act," *Sanchez*, 596 F.3d at 1303–04, or, at the least, whether Raney's discharge "had *something* to do with the False Claims Act—or at least that a reasonable person might have thought so," *Hickman*, 985 F.3d at 1289.

Taking Raney's allegations as true, the court concludes that these possibilities did not exist.  Raney maintains that Amedisys admitted patients who did not need home health services or skilled care "for the sole purpose of increasing the bottom line." Doc. 31 at 7–8.  It is true that fraudulent billing is a quintessential example of the claims the FCA addresses. *See Hickman*, 985 F.3d at 1285 ("[The FCA] provides a way for individuals, and ultimately the United States itself, to bring an action to recover damages for false claims made to the federal government—fraudulent billing, for example.").  However, Raney has failed to plead facts that support an inference that she engaged in protected conduct.  In particular, based on her pleading, Amedisys could not have feared that she was contemplating filing a qui tam action or reporting Amedisys to the government for fraud.  Therefore, she has not

sufficiently pleaded that Amedisys discharged her because of her alleged efforts to stop FCA violations.[5]

The defendants (and Raney in her opposition brief) discuss only Raney's alleged involvement in the incident with E.H., but the court evaluates Raney's allegations in full, including the incidents she describes in 2017 and 2018. Notwithstanding the defendants' narrow focus on the 2019 incident with E.H., they rely in part on *Farnsworth v. HCA, Inc.*, No. 8:15-CV-65-T-24-MAP, 2015 WL 3453621 (M.D. Fla. May 29, 2015), the reasoning of which is persuasive. In *Farnsworth*, the Middle District of Florida dismissed Farnsworth's FCA retaliation claim because "most of the incidents or practices about which Farnsworth complain[ed]" failed to allege that Farnsworth "did anything to stop or prevent an incident or practice from occurring" and/or that she "reported the incident or practice to her superiors so that they were aware of the problem and aware that Farnsworth was trying to stop it." 2015 WL 3453621, at *7. Moreover, "in those instances when Farnsworth did internally report, the complaint [did] not allege that the conduct or practice resulted in the submission of a false claim to the government." *Id.* The court explained:

---

[5] "Section 3730(h) protects an employee's conduct even if the target of an investigation or action to be filed was innocent." *Sanchez*, 595 F.3d at 1303 n.6 (quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 (2005)). Therefore, it is irrelevant that Amedisys may not have committed the FCA violations Raney initially believed or alleged it had.

> For example, Farnsworth allege[d] various problems relating to Dr. Al-Andary's orders, non-employee medical records personnel, and mistakes in medical records, but she set[] forth no allegations that she did anything to oppose such practices or inform her superiors about them. Conversely, while Farnsworth allege[d] that she acted in opposition to the late reported sexual abuse and understaffing, she [did] not explain how such opposition relate[d] to the submission of a false claim to the government.

*Id.* In short, where Farnsworth alleged potential misconduct, she failed to allege that she tried to report or stop the misconduct; where she did report potential misconduct, she failed to include in this reporting that the conduct may have led to improper billing. *See id.*

By contrast, in *Sanchez*, the Eleventh Circuit concluded that the district court erred in dismissing Sanchez's FCA retaliation claim. 596 F.3d at 1304. Sanchez alleged that "she 'complained again and again about the unlawful actions of the [d]efendants,'" whom she alleged engaged in false billing to Medicare, and "'told [the defendants] that they were all incurring significant criminal and civil liability.'" *Id.* at 1303. The Eleventh Circuit determined that these allegations "[were] sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act." *Id.* at 1304.

Here, Raney asserts that she made efforts to report and stop alleged violations of the FCA: when she reported and discharged employees who did not perform the care they claimed to perform, doc. 3 at ¶ 34; stopped and reported services that should not have been billed to Medicare, *id.* ¶ 44; and resisted her superiors' alleged

efforts to admit E.H., ostensibly so Amedisys could bill the care to Medicare, *id.* ¶¶ 21–24.  However, Raney's filings do not contain any statements alleging that Raney told her supervisors or superiors that these incidents were resulting in false billing or false claims to Medicare, or, as in *Sanchez*, that they were "incurring significant criminal and civil liability."  596 F.3d at 1303.  Put simply, nowhere in the complaint does Raney allege she informed her superiors they were engaging in illegal conduct.  Rather, taking all of the allegations as true, the complaint establishes only that Raney witnessed what she perceived as misconduct by Amedisys employees and reported these instances to superiors as just that—general misconduct[6]—not the submission of false claims to the government.[7]

---

[6] For example, Raney pleads that she discharged two employees "when it became apparent that they had not actually treated their patients" and that she "report[ed] these matters to Mike Brown and Human Resources."  *See* doc. 3 at ¶¶ 34, 36.  However, Raney pleads nothing further about *what* she reported.  On the facts alleged, it is unclear to the court whether Raney conveyed to her superiors that she discharged the employees for general workplace misconduct or ineptitude or because Amedisys was submitting false claims to Medicare due to the conduct of these employees.  It is the latter, and not the former, that constitutes protected conduct under the FCA.

[7] To be sure, Raney also describes other potential misconduct—such as Amedisys' alleged revisions of patient evaluations to "bill[] at the highest possible level, regardless of the patient's actual condition and care needs—but she does not state she reported these actions, internally or otherwise.  *See, e.g.*, doc. 3 at ¶ 17.  And Raney states also that she reported the provision of education services at SCALFs and the conduct of employees who failed to properly provide care and protested a patient's characterization as "homebound."  *Id.* ¶¶ 21–24, 34, 44.  However, she does not allege she reported Amedisys' alleged fraudulent billing to superiors internally or agencies externally.

2.

Relatedly, Raney's allegations also do not plausibly suggest that Amedisys knew Raney believed the company was engaging in fraudulent billing. To be sure, Raney pleads that she protested the recommendation that the patient E.H. was "homebound" and that two Amedisys superiors told her she would have to admit the patient regardless—in one case, in Grau's words, because "[i]f it's a Medicare then we say yes." Docs. 3 at ¶ 24; 31 at 8. But Raney's protestations about E.H. to her superiors, as alleged, do not seem to implicate false billing to Medicare. Raney does not plead what she said to her superiors and states only that "E.H. was then admitted to home health care despite everyone involved knowing of the fraud, and in spite of Raney's efforts to take a lawful approach to this situation." Doc. 3 at ¶ 24. Because Raney does not allege that her complaints or resistance clued Amedisys into the possibility of FCA liability or that she was taking steps to stop FCA violations, the court is not persuaded, based on Raney's pleading, that Amedisys was actually aware of Raney's belief that Amedisys was violating the FCA.[8] *See Sanchez*, 596 F.3d at 1304.

---

[8] In her brief, Raney argues that Amedisys had notice that her complaints involved the FCA "because it was strikingly similar [to] conduct that resulted in a $150 Million Settlement announced by the U.S. Department of Justice [and Amedisys] on April 23, 2014." Doc. 31 at 7. But, as one court aptly put it, "[t]he fact of a previous settlement of claims between a defendant and the government has no bearing on whether the complaint adequately alleges plaintiff's claims against the defendant." *United States ex rel. Manieri v. Avanir Pharms., Inc.*, No. 5:15-cv-0611, 2021 WL 857102, at *3 (N.D. Ohio Mar. 8, 2021).

3.

And still, Raney must plead facts that allege that Amedisys discriminated against Raney *because* of her conduct, assuming it was protected. In other words, Raney must plausibly allege that, but for her efforts to report and stop Amedisys' alleged submissions of false claims to Medicare, Amedisys would not have retaliated against her. *See Nesbitt*, 945 F.3d at 1358–59. Raney alleges she engaged in protected conduct in 2017, when she reported internally that the SCALFs were improperly receiving education services; in 2018, when she discharged employees for their alleged failure to perform services and reported these instances internally; and in 2019 through her objection to admitting the patient E.H. Doc. 3 at ¶¶ 22–24, 34–36, 44.

Raney asserts Amedisys subsequently retaliated against her by giving her a "poor annual review," assigning someone to shadow her, and discharging her for "purely pretextual reasons" in mid-2019, following the events concerning E.H. *Id.* ¶ 25. The alleged retaliation therefore occurred between April 17, 2019—when Raney met with Sanders and Grau—and late June of 2019, culminating in Raney's discharge on or around June 26. *See id.* Given the temporal distance between Raney's 2017 reports or the 2018 conduct[9] and her 2019 discharge, there does not

---

[9] It is unclear from the pleadings when exactly Raney reported and discharged other employees who allegedly failed to perform the care they claimed to provide to their patients. But even

14

appear to be a "but-for" causal connection between Raney's actions in 2017 and 2018 and Amedisys' retaliatory conduct.[10]

Setting the 2017 and 2018 conduct aside, then, the court turns to Raney's explicit claim that her conduct in April of 2019 related to E.H. caused her discharge in mid-2019. Raney alleges that Amedisys discharged her "for purely pretextual reasons," doc. 3 at ¶ 25, because Amedisys "never offered any reasonable explanation to [her] as to why she was terminated," doc. 31 at 10. She seems to argue that the temporal proximity between these events suggests her discharge was caused by her conduct regarding Amedisys' characterization of the patient E.H. as homebound. Doc. 3 at ¶ 25 ("From this point forward, Raney was retaliated against…"). But "mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). And even assuming Raney's 2019 conduct was "protected" under the FCA, and that Amedisys was aware of Raney's effort to prevent this FCA violation, Raney fails to plead any

---

assuming she did so as late as December 31, 2018, the conduct is still too far removed from the alleged retaliation.

[10] *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'"); *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) (two-month gap between protected activity and adverse action insufficient by itself to show causal connection); *Milner v. Team Health*, No. 2:19-CV-02041-GMB, 2020 WL 5658903, at *7 (N.D. Ala. Sept. 23, 2020) (employee failed to plead facts plausibly showing causal connection between his discharge, which occurred more than three years after his alleged protected conduct, and alleged protected conduct).

further explanation of Amedisys' alleged adverse employment actions[11] or why she believes the reason proffered for her discharge is unreasonable. It is possible Raney's poor annual review, which Brown later "had to revise for lack of any basis," doc. 3 at ¶ 25, followed by Raney's shadowing by Winstead, was motivated by Raney's protestation. But Raney has failed to plead facts that plausibly allege as such. Also, Raney does not allege the "purely pretextual reasons" that Amedisys provided for discharging her, or what Amedisys did or said that indicates her discharge was motivated by her efforts to stop fraudulent conduct, much less FCA violations.

In the end, the court has only Raney's contention that the mere proximity makes her discharge a product of retaliatory animus. This, by itself, is insufficient where Raney has not pleaded facts that show the defendants were actually aware of her belief that they were violating the FCA or that her alleged protests factored into her discharge. Thus, Amedisys' motion is due to be granted for failure to state a claim for retaliation under the FCA.

---

[11] Retaliation includes, among other adverse actions, discharge, demotion, and suspension. 31 U.S.C. § 3730(h)(1); *see HPC Healthcare*, 723 F. App'x at 791. In that respect, Raney's discharge qualifies as an adverse action. However, with regard to the other actions—the annual review and the shadowing of Raney—Raney fails to describe these actions with enough specificity such that the court can clearly tell they rise to an "adverse" action.

B.

The court turns briefly to the defendants' argument that Raney's complaint "impermissibly relies on group pleading," in that Raney sued "two distinct entities" (Amedisys, Inc. and Amedisys Home Health of Alabama, LLC), yet "only ever 'collectively refer[s]' to them both as 'Amedisys' generically." Doc. 29 at 15. Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must give each defendant "fair notice" of each claim and the ground on which it rests. *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir. 2012). A plaintiff can plead claims against multiple defendants by referring to them collectively, and allegations "usually are to be read in such a way that each defendant is having the allegation made about him individually." *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997). But when a plaintiff makes broad allegations about "a large and diverse group of defendants," this runs the risk of "leaving unclear just who is alleged to have committed which acts." *1-800-411-I.P. Holdings, LLC v. Ga. Injury Ctrs., LLC*, 71 F. Supp. 3d 1325, 1330 (S.D. Fla. 2014) (citing *Pierson*, 619 F. Supp. 2d at 1271–74).

In *Pierson*, the Middle District of Florida determined that the plaintiff failed to sufficiently plead claims against a set of individuals and groups he collectively referred to as "the Peer Review Defendants" without differentiation of each defendant's alleged conduct. 619 F. Supp. 2d at 1273–74. In his complaint, the

17

plaintiff named 26 defendants—Orlando Regional Healthcare Systems, its CEO, 15 individual physicians, two physician groups, and seven government entities—alleging claims ranging from antitrust violations and the unconstitutionality of federal and state laws to breach of contract. *Id.* at 1266–67. Though the introductory paragraph of the complaint listed the defendants by name, the plaintiff used the term "the Peer Review Defendants" to refer to the individual defendants and the two physician groups throughout; the defendants protested that the complaint did not describe the actions each defendant allegedly took against the plaintiff. *Id.* at 1271. Agreeing, the district court held that the "grouping together" of the defendants "without differentiation or some sort of description of actions that could provide 'fair notice' of the basis for the claims against them" required repleading. *Id.* at 1274.

By contrast, in *1-800-411-I.P. Holdings*, the Southern District of Florida declined to dismiss a complaint for failure to satisfy the pleading standard where the complaint alleged that four defendants—two individuals and their two companies—each participated in the conduct that supported each of the plaintiff's claims. 71 F. Supp. 3d at 1330. Specifically, the district court held that the plaintiff's "use of the collective reference 'Defendants' [did] not deprive Defendants of fair notice of the conduct attributed to them; it simply signal[ed] that Defendants [were] each alleged to have participated in the conduct at issue." *Id.*

Here, Raney alleges both defendants employed her and played a role in the alleged retaliation.  She collectively refers to the defendants as "Amedisys," but the court is not convinced that this fails to give the defendants fair notice.  This is unlike *Pierson*, where the plaintiff asserted a variety of federal and state claims against 26 defendants without specifying which individual or group performed which allegedly unlawful act.  *See Pierson*, 619 F. Supp. 2d at 1273–74.  Rather, Raney alleges one claim of retaliation and contends both defendants are liable.  Doc. 30 at 10.  While the defendants could have demonstrated that only one of them actually participated in the conduct underlying Raney's claim, the defendants do not explain in their briefing that only one of them can possibly be liable for the conduct Raney pleads.  The argument that Raney impermissibly engaged in group pleading fails.

## IV.

The defendants' motion to dismiss is due to be granted.  A separate order dismissing this case without prejudice will be entered.

**DONE** the 29th day of September, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE